Redacted Version

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

SYSTEM DYNAMICS
INTERNATIONAL, INC.

      *Plaintiff,*

v.

UNITED STATES,

      *Defendant.*

Case No. _____

Judge _____

███████████████████████

## COMPLAINT

For its bid protest complaint against the United States of America, Plaintiff System Dynamics International, Inc. ("SDI") shows the Court as follows:

### Nature of the Action

1.      The United States Department of the Army (the "Agency") notified SDI that it made an award to Strata-G Solutions, LLC ("Strata-G") under request for proposal number W58RGZ-22-R-0073 (the "RFP" or "Solicitation").  SDI protests the Agency's evaluation and award decision, as well the failure to recognize and address Strata-G's potential OCI.

### The Parties

2.      SDI is a corporation headquartered in Huntsville, Alabama.

3.      The United States of America, for all purposes relevant hereto, acted by and through the Agency.

**Jurisdiction and Standing**

4.     The Court has subject-matter jurisdiction over this bid protest under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996.  28 U.S.C. § 1491(b)(1).

5.     SDI is an "interested party" because it is an actual bidder and, absent the errors alleged in this complaint, had a substantial chance of receiving award.

6.     SDI suffered competitive prejudice because, but for the Agency's evaluation errors and award decision, it had a substantial chance of receiving an award—SDI is also within the zone of active consideration for award.

**The Applicable Pleading Standard**

7.     The *Twombly / Iqbal* pleading standard applies at the U.S. Court of Federal Claims.  *See Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 399 (2020). However, as (now) Chief Judge Kaplan noted, "a party need only plead 'facts to state a claim to relief that is plausible on its face,' and the alleged facts must be sufficient to nudge 'claims across the line from conceivable to plausible.'"  *Id*. (quoting *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)).  Chief Judge Kaplan also explained that the Federal Circuit approves "information and belief" allegations where 'when essential information lies uniquely within another party's control,' at least 'if the pleading sets forth the specific facts upon which the belief is reasonably based.'"  *Id*. (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009)).

**Factual Background**

**The Solicitation**

8.      Through the Solicitation, the Agency would award a single-award Indefinite Delivery/Indefinite Quantity ("IDIQ") contract for Soldier Unmanned Aircraft Systems ("SUAS") design and development engineering and services.

9.      The Agency intended to award a contract to the bidder presenting the "best value" to the Agency.

10.      The Agency anticipated awarding a one-year contract with four one-year options. The Solicitation included seven contract line item numbers ("CLINs"), four of which were separately priced.  CLIN 1 was for design/develop engineering labor was cost-plus-fixed fee. CLINs 3, 4, and 5, for travel, materials, and over and above other direct costs, were cost but no fee.

11.      The awardee would provide engineering support for Group I UAS, which consists primarily of the short-range, medium-range, and long-range reconnaissance aircrafts, as well as a Handheld-Ground Control Station ("H-GCS").  This would include making modifications to components and maintaining support for: the existing fleet of legacy RQ-11B Raven UAS; RQ-11B Raven modified for frequency reallocation configurations; RQ-20A Puma; and a short-range reconnaissance Air Vehicle "(i.e., quadcopter-like SUAS)."

12.      The base IDIQ Performance Work Statement ("PWS") required 13 tasks.  The tasks were as follows:

- Program Management

- Systems Engineering

- Configuration Management / Data Management

- Technical Assessment and Support

- Test and Evaluation

- Production Readiness and Quality Assurance

- Engineering Sustainment

- Software Sustainment

- Cybersecurity

- Obsolescence / Diminishing Manufacturing Source Risk Management

- Safety

- Airworthiness Support

13.     While each task included several sub-tasks, and many of the sub-tasks described additional sub-sub-tasks, the IDIQ envisioned that the awardee would make recommendations on broad mission management goals, including:

The Contractor shall review and/or prepare plans, requirements, summaries, agreements, objectives, policies, strategies, justifications, memorandums, models, criteria, assessments and/or procedures to support program and mission area management

The Contractor shall attend and support SUAS meetings and IPTs and provide recommendations regarding product development, system safety, system / software development, formal and informal reviews, technical status meetings, and integration and testing activities

The Contractor shall perform an assessment of the system architecture on current and future SUAS programs and conduct a preliminary assessment of components, special tools, and training devices for SUAS programs and provide recommendations as to the impact to SUAS and deliver Technical Reports

The Contractor shall generate design information documentation for SUAS and/or Commercial Off-The-Shelf (COTS) systems

The Contractor shall perform an assessment of the system architecture on current and future SUAS programs and conduct a preliminary assessment of components, special tools, and training devices for SUAS programs and provide recommendations as to the impact to SUAS and deliver Technical Reports

The Contractor shall provide recommendations for the integration of technologies and components into SUAS products to improve performance, reduce costs, and improve sustainability

The Contractor shall conduct and support System Requirements Reviews (SRR), System Functional Reviews, Preliminary Design Reviews (PDR), and Critical Design Reviews (CDR)

14.      The Agency also intended to award a task order with the contract, which it would evaluate in conjunction with the Solicitation.  The purpose of the task order was to design and develop a wireless interface between the H-GCS and ground radio.

15.      More specifically, the awardee would perform market research, design, draft a technical data package, and develop an interface control documents for an H-GCS.  The awardee would then develop and deliver five prototype units to SUAS.

**Instructions and Evaluation Criteria**

16.      The Solicitation said that the Agency would evaluate offers under three factors: Technical; Past Performance; and Cost/Price.

17.      The Agency said, "the Technical factor is significantly more important than Cost/Price.  When combined, all non-cost/price factors are significantly more important than the Cost/Price factor."

18.     The Agency also requested an organizational conflicts of interest ("OCI")

mitigation plan.  The OCI plan was to address all aspects of FAR 9.5 as well as include an

organizational chart and entry/exit non-disclosure agreement templates for employees.  The

Agency told offerors they would be required to manage subcontractor work distribution "to

ensure there are no OCI considerations."

<u>The Technical Factor</u>

19.     The Agency said it would evaluate the Technical factor for "adequacy of

response" and "feasibility of approach."

20.     For adequacy of response, the Agency would evaluate proposals to determine

whether the offeror's methods and approach have adequately and completely considered,

defined, and satisfied the requirements specified in the RFP.  The Agency would also evaluate to

determine the extent to which offerors addressed each requirement in accordance with the

proposal submission section of the RFP.

21.     For feasibility of approach, the Agency would evaluate proposals to determine the

extent to which: the proposed approach is workable and the end results achievable; successful

performance is contingent upon proven devices and techniques; and the offeror is expected to be

able to successfully complete the proposed tasks and technical requirements within the required

schedule.

22.     The Agency would evaluate the Technical factor using the following combined

technical/risk ratings:

| COMBINED TECHNICAL/RISK RATINGS | | |
|---|---|---|
| Color | Rating | Description |
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

23.     The Agency would consider risk using the following definitions:

Low Risk – Proposal may contain weaknesses, which have little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties.

Moderate Risk – Proposal contains a significant weakness or combination of weaknesses, which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties.

High Risk – Proposal contains a significant weakness or combination of weaknesses, which is likely to cause significant disruption of schedule, increased cost or degradation of performance. Is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring.

Unacceptable Risk – Proposal contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an unacceptable level.

24.     The Agency also defined deficiency, significant strength, strength, significant

weakness, weakness, and uncertainty:

> Deficiency. A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. See FAR 15.001. Examples of deficiencies include a statement by the offeror that it cannot or will not meet a requirement, an approach that clearly does not meet a requirement, or omission of data required to assess compliance with the requirement.

> Strength. An aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance.

> Significant Strength. An aspect of an offeror's proposal that has appreciable merit or appreciably exceeds specified performance or capability requirements in a way that will be appreciably advantageous to the Government during contract performance.

> Uncertainty. Any aspect of a non-cost/price factor proposal for which the intent of the offer is unclear (e.g., more than one way to interpret the offer or inconsistencies in the proposal indicating that there may have been an error, omission, or mistake).

> Weakness. A flaw or omission in the proposal that increases the risk of unsuccessful contract performance. See FAR 15.001.

> Significant Weakness. A flaw that appreciably increases the risk of unsuccessful contract performance.

<u>Technical Subfactors</u>

25.     The Technical factor consisted of three subfactors: Subfactor 1, Technical

Understanding; Subfactor 2, Management of Resources; and Subfactor 3, Initial Task Order.

Subfactor 1 was significantly more important than Subfactor 2, which was more important than

Subfactor 3.

26.     Under Subfactor 1, Technical Understanding, the Agency would evaluate offerors

on how they intend to perform all aspects of the SUAS technical support services in accordance

with the PWS.  The Agency would also evaluate how well the offeror demonstrates an understanding of the Army PEO Aviation UAS Project Office mission and programmatic needs and how well it would meet the performance requirements outlined in the Quality Assurance Surveillance Plan ("QASP").

27.     Under Subfactor 2, Management of Resources, the Agency would evaluate the offeror's proposed approach to recruiting/obtaining, training, retaining, and replacing personnel of appropriate qualifications, experience, education, and skill levels.  The Agency would also evaluate whether the offeror is planning, scheduling, optimizing, and allocating resources to tasks and initiatives to achieve the greatest organizational value.  The Agency said it would consider how the offeror's proposed skill mix corresponds to the skill mix the Agency included in the Labor Category Mapping appendix.  Finally, the Agency would evaluate the offeror's approach to managing workload fluctuations, maintaining required personnel, and ensuring timely availability and cost effectiveness of contractor resources.

28.     Under Subfactor 3, Initial Task Order, the Agency would evaluate the offeror's technical approach in meeting the Program, Contract, and Management objectives as stated in the Task Order PWS.  That is, the Agency would evaluate each offeror's approach to designing and developing an H-GCS.

<u>The Past Performance Factor</u>

29.     In Past Performance, the Agency sought no more than five recent or current contract references performed within four years of Solicitation release.

30.     The Agency said it would evaluate these efforts, others at its discretion, and all terminated contracts within four years.

31.     The Agency would evaluate all contracts for relevancy and performance confidence assessment.

32.     The Agency would consider contracts relevant if they were equal to or greater than $500,000 and with comparable scope as this PWS.

33.     The Agency would evaluate performance confidence based on the assessed quality of the relevant/recent efforts presented for review.  The Agency would consider offerors' descriptions and external research of such databases as CPARS, SAM, the excluded parties list, and FAPIIS.

34.     The Agency would evaluate Past Performance to determine an offeror's ability to perform the contract successfully and as a measure of the Agency's confidence in an offeror's ability to perform the Solicitation's requirements.

35.     The relevancy ratings were:

| Adjectival Rating | Description |
| --- | --- |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |

| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

36.     The confidence ratings were:

| Performance Confidence Assessments | |
|---|---|
| **Rating** | **Description** |
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will successfully perform the required effort. |
| Unknown Confidence (Neutral) | No recent/relevant performance record is available or the offeror's performance record is so sparse that assignment of meaningful confidence assessment rating is not feasible. |

<u>Cost/Price Factor</u>

37.     For Cost/Price, the Agency said it would evaluate proposals for compliance with the submission requirements, balance, reasonableness, realism, business systems, and professional compensation in accordance with FAR 52.222-46.

38.     Regarding reasonableness, the Agency said cost/price is reasonable if "in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business."

39.     The Agency would perform a realism analysis "on the CPFF CLINs and on the indirect costs in the cost reimbursable Travel, Material, and Other Direct Cost (ODC) CLINs to determine whether specific estimated proposed cost elements are realistic for the work to be performed, reflect a clear understanding of contract requirements, and are consistent with the unique methods of performance described in the offeror's Technical proposal."

40.     The Agency would also evaluate the offeror's understanding of the contract's technical requirements and the risk associated with the offeror's technical proposal.

41.     The Agency had bidders respond to a notional skill mix, set forth below.  The Agency directed offerors to use the total number of hours per CLIN, but allowed them to deviate from the skill mix with an adequate explanation.

| Direct Labor Hours | CLIN 0001 | CLIN 1001 | CLIN 2001 | CLIN 3001 | CLIN 4001 | CLIN 5001 | Total Hours |
|---|---|---|---|---|---|---|---|
| Program | - | 1,920 | 1,920 | 1,920 | - | | 5,760 |

| Direct Labor Hours | CLIN 0001 | CLIN 1001 | CLIN 2001 | CLIN 3001 | CLIN 4001 | CLIN 5001 | Total Hours |
|---|---|---|---|---|---|---|---|
| Manager III | | | | | | | |
| Program Manager II | 1,920 | 4,800 | 4,800 | 4,800 | 2,400 | 1,200 | 19,920 |
| Systems Engineering III | - | 2,880 | 2,880 | 2,880 | 1,920 | 960 | 11,520 |
| Systems Engineering II | 2,880 | 9,600 | 7,680 | 7,680 | 2,880 | 1,440 | 32,160 |
| Systems Engineering I | - | 10,560 | 10,560 | 10,560 | 960 | 480 | 33,120 |
| Configuration Mgt & Data Mgt II | 960 | 5,760 | 5,760 | 4,800 | 1,920 | 960 | 20,160 |
| Configuration Mgt & Data Mgt I | 960 | 1,920 | 1,920 | 1,920 | 960 | 480 | 8,160 |
| Design Engineer III | - | 7,680 | 5,760 | 3,840 | 1,920 | 960 | 20,160 |
| Design Engineer II | 4,800 | 7,680 | 9,600 | 9,600 | - | - | 31,680 |
| Design Engineer I | 2,880 | 15,360 | 13,440 | 11,520 | 1,920 | 960 | 46,080 |
| Test & Evaluation Engineer III | - | 960 | 960 | 960 | - | - | 2,880 |
| Test & Evaluation Engineer II | 1,920 | 9,600 | 9,600 | 7,680 | 2,880 | 1,440 | 33,120 |

| Direct Labor Hours | CLIN 0001 | CLIN 1001 | CLIN 2001 | CLIN 3001 | CLIN 4001 | CLIN 5001 | Total Hours |
|---|---|---|---|---|---|---|---|
| Test & Evaluation Engineer I | 480 | 3,840 | 7,680 | 7,680 | 2,400 | 1,200 | 23,280 |
| Production & Quality III | - | - | - | - | 1,920 | 960 | 2,880 |
| Production & Quality II | - | 2,880 | 4,800 | 2,880 | 2,880 | 1,440 | 14,880 |
| Production & Quality I | 960 | 3,840 | 3,840 | 3,840 | 960 | 480 | 13,920 |
| Logistics Engineering II | 480 | 960 | 960 | 960 | 1,920 | 960 | 6,240 |
| Logistics Engineering I | 480 | 3,840 | 3,840 | 3,840 | 1,440 | 720 | 14,160 |
| Software Engineering III | - | 7,680 | 16,320 | 5,760 | - | - | 29,760 |
| Software Engineering II | 1,440 | 19,200 | 13,440 | 11,520 | 1,920 | 960 | 48,480 |
| Software Engineering I | 480 | 18,240 | 5,760 | 14,400 | 1,440 | 720 | 41,040 |
| Cybersecurity Engineer II | 1,440 | 4,800 | 4,800 | 2,880 | 1,920 | 960 | 16,800 |
| Cybersecurity Engineer I | 480 | 1,920 | 1,920 | 3,840 | 480 | 240 | 8,880 |
| Safety Engineer II | 960 | 3,840 | 3,840 | 3,840 | 3,360 | 1,680 | 17,520 |
| Safety Engineer I | 960 | 3,840 | 2,880 | 2,880 | 1,440 | 720 | 12,720 |
| Technical | - | 3,840 | 3,840 | 3,840 | 1,920 | 960 | 14,400 |

14

| Direct Labor Hours | CLIN 0001 | CLIN 1001 | CLIN 2001 | CLIN 3001 | CLIN 4001 | CLIN 5001 | Total Hours |
|---|---|---|---|---|---|---|---|
| Writer II | | | | | | | |
| Technical Writer I | 1,920 | 5,760 | 4,800 | 4,800 | 1,440 | 720 | 19,440 |
| Administrative Assistant | - | 1,920 | 1,920 | 1,920 | | | 5,760 |
| Labor Hours Subtotal | 26,400 | 165,120 | 155,520 | 143,040 | 43,200 | 21,600 | 554,880 |

42.     Finally, the Agency would perform a compensation analysis.  It would focus on a review of the compensation plan to ensure each offeror's plan "reflects a sound management approach and understanding of the contract requirements."

**Unsuccessful Offeror Notice and Debriefing**

43.     SDI timely submitted a responsive, complaint, and awardable quote.

44.     On March 6, 2023, the Agency notified SDI that it awarded a contract to Strata-G and SDI timely requested a debriefing.

45.     The debriefing occurred on Thursday, March 16.  SDI prepared and timely submitted enhanced debriefing questions to the Agency on Monday, March 20.  The Agency responded to SDI's questions on March 22, which completed the enhanced debriefing process.

46.     The Agency evaluated proposals as follows:

| Evaluation Factor/Subfactor | SDI | Strata-G |
|---|---|---|
| Technical Overall | | Good |
| Subfactor 1 | | Good |
| Subfactor 2 | | Good |
| Subfactor 3 | | Good |
| Past Performance Relevancy and Confidence | | Relevant/ Satisfactory Confidence |
| Total Evaluated Price | | $71,770,380 |

47.     Underlying the Good Technical rating, SDI received ▮ significant strength, ▮ strengths, ▮ weaknesses, and ▮ significant weakness.  It received ▮ significant strength, ▮ strengths, ▮ weaknesses, and ▮ significant weakness under subfactor 1, ▮ strengths and ▮ weaknesses under subfactor 2, and ▮ strengths and ▮ weakness under subfactor 3.[1]

48.     The Agency made a most probable cost adjustment to SDI's price, and adjusted SDI's price down from ▮▮▮▮ to ▮▮▮▮, a difference of ▮▮▮▮.  The Agency explained that it reduced the proposed costs because it 



49.     The Agency told SDI that the Independent Government Estimate ("IGE") was ▮▮▮▮, which is almost ▮▮▮▮ than SDI's proposed price and ▮▮▮▮ than the TEP.

---

[1] On one page of the debriefing, the Agency said SDI had an overall ▮▮▮▮ rating, which converted to ▮▮▮▮ when the Agency answered SDI's questions.  Both are wrong.



50.     Strata-G proposed a cost that was more than ██████████ than that proposed by

SDI and ██████████ than the IGE.  Yet, the Agency found the price realistic.

51.     Despite receiving a lower Past Performance rating, the Agency made award to

Strata-G because it "offered an excellent technical capability approach that exceeds several areas

of the PWS," a lower proposed Cost, and a Satisfactory past performance rating.


**COUNT ONE**
**STRATA-G HAS A CONTRACT WITH A REQUIREMENT FOR AN H-GCS THAT**
**GIVES IT UNEQUAL ACCESS TO INFORMATION AND ITS DUTIES UNDER THE**
**AWARDED CONTRACT GIVE IT AN IMPAIRED OBJECTIVITY OCI**

52.     SDI realleges and incorporates the allegations of the preceding paragraphs by

reference as if fully set forth herein.

53.     In April 2021, the Agency awarded Strata-G a contract to produce H-GCS kits for

medium and short-range reconnaissance UAS.  Because the task order was issued under an IDIQ

contract, it was not synopsized.  48 C.F.R. § 16.505(a)(1).

54.     Strata-G discusses the award on its website, reproduced below.



55.     As the article says, "Strata-G will deliver these H-GCS Kits, consisting of the handset with cover, secondary display, MRR Kit, SRR Kit, and all other components contained in the Technical Design Package (TDP) needed to allow the systems to meet the requirements needed to control the MRR and SRR air vehicles."

56.     Strata-G has access to the Agency's TDP, schematics, interface, and communications capabilities for an H-GCS that the Agency will use for the wireless interface between the H-GCS and ground radio requested under Task Order 1.

57.     SDI asked during the debriefing whether the Agency considered Strata-G's production of the H-GCS to be an organizational conflict of interest.  At the time of the debriefing, the Agency deferred its answer.

58.     The Agency then submitted a written, and extremely carefully worded, response to SDI's enhanced debriefing question on this topic:  "No Offeror, including Strata-G, had access to proprietary information obtained from the Government without proper authorization or unequal access to source selection information."

59.     The Agency essentially admitted that Strata-G had access to key data it would need to compete on this effort.  According to the Agency, Strata-G did not do so "without proper authorization."  That still gives Strata-G an unequal access OCI.

60.     On information and belief, Strata-G did not provide an OCI mitigation plan for its H-GCS production, and the Agency did not consider whether personnel within Strata-G had access to that data when it wrote proposals.  Certainly, the Agency did not have time to conduct an investigation after SDI asked its question.

61.     Moreover, after award and as the company responsible for designing the wireless interface, Strata-G will be in a position to supervise its own production work on the H-GCS.  The IDIQ requires Strata-G to attend meetings and make status and design recommendations for current programs—of which the H-GCS contract is one.

62.     Strata-G therefore has an impaired objectivity OCI.  The Agency did not address this in its answer to SDI's question, which means it has obviously not considered it.

63.     Strata-G's failure to disclose its potential OCIs violated the Solicitation.  The Agency's failure to consider Strata-G's OCIs and whether they can be mitigated is arbitrary, capricious, irrational, and contrary to law.

64.     The Agency's failure to conduct a proper investigation prejudiced SDI because Strata-G cannot mitigate or did not mitigate its OCIs.  As evaluated, SDI received the same ratings as Strata-G and proposed a realistic price.  As properly evaluated, SDI would have received higher ratings, and Strata-G would have been ineligible because of its OCIs.  SDI therefore stood a substantial chance of receiving award.

## COUNT TWO
## THE AGENCY'S EVALUATION OF PROPOSALS UNDER THE TECHNICAL FACTOR WAS ARBITRARY AND IRRATIONAL

65.     SDI realleges and incorporates the allegations of the preceding paragraphs by reference as if fully set forth herein.

66.     The Agency assigned adjectival ratings that do not match the definitions in the Solicitation and ignore the strengths SDI received.

67.     The Agency awarded SDI ▮ significant strength, ▮ strengths, ▮ weaknesses, and ▮ significant weakness under the Technical factor.  Given that SDI's ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—one would expect SDI to have received an Outstanding rating.  However, it received a ▮▮▮ rating.  The Agency also assigned SDI a risk rating of "low to moderate."

68.     Under Subfactor 1 Technical Understanding—the most important subfactor—the Agency assigned SDI ▮ significant strength, ▮ strengths, ▮ weaknesses, and ▮ significant

weakness.  According to the Agency, it assigned a ▮▮▮▮ rating under this subfactor because SDI proposed a "thorough approach and understanding of the requirements."  The Agency identified SDI's proposal as "low risk."  The Agency said, among other things, that:



69.     The Agency did not explain why SDI received only a ▮▮▮▮ rating, other than to repeat some of the weaknesses, claiming (incorrectly) that SDI did not address aspects of the PWS or certain CDRLs.

70.     Under Subfactor 2—Management of Resources, SDI received ▮▮ strengths and ▮▮ weaknesses.  It received only a ▮▮▮▮ rating because it "proposed a thorough approach."  While the Agency listed the strengths, it did not explain why the approach was merely "thorough."

71.     Moreover, the Agency assigned a risk rating of low to moderate.  Moderate risk requires "a significant weakness or combination of weaknesses, which may potentially cause disruption of schedule, increased cost or degradation of performance."  SDI ███████████ ██████████  Therefore, it could not have received a Moderate risk rating.  Similarly, a Low risk rating was improper.  It is defined as "Proposal may contain weaknesses which have little potential to cause disruption of schedule, increased cost or degradation of performance."  Again, SDI ███████████  Therefore, only a Very Low risk rating would have been appropriate. That is a hallmark of an Exceptional proposal.

72.     Under Subfactor 3—Task Order 1, the Agency assigned SDI ████ strengths and ████ weakness and gave it an ██████████ rating.  ██████████ requires offsetting strengths and weaknesses, which was not the case here.  It also requires a risk of performance no worse than moderate.  Again, SDI's evaluation does not meet the definition of Moderate risk.

73.     The Agency found that Strata-G had "an excellent technical capability approach." The Solicitation does not use the term "excellent" in its adjectival ratings.  It uses the term "exceptional" to describe an Outstanding adjectival rating.  For Good, the Solicitation uses the term "thorough" to describe approach.  According to Oxford Languages, which produces the Oxford English Dictionary, "excellent" is a synonym of "exceptional;" it is not a synonym of "thorough."  Stata-G received only Good ratings, which is defined in part by a "thorough" approach.  An "exceptional" rating, or any derivation thereof, contradicts Strata-G's rating and is facially arbitrary.  It also signals that the Agency improperly overemphasized Strata-G's ratings to inflate Price's importance.

74.     SDI had ████████████████████████████████ under the most important subfactor.  It had ████████ strengths and ██ weaknesses under the second most important subfactor, and ████████████████████████ under the least important subfactor.  On information and belief, Strata-G did not receive as many strengths, yet it received the same overall rating and a higher rating under Subfactor 3.  The Agency improperly leveled proposals by assigning the same rating to each offeror.

75.     Beyond the erroneously assigned ratings, the Agency got several weaknesses wrong.

76.     Under Subfactor 1, the Agency found that SDI did not adequately address various areas with respect to the PWS requirements (3.3.5, 3.3.7, 3.4.3, 3.4.4, 3.5.12, 3.6.1, 3.6.3, 3.6.5, 3.7.1, 3.10.11, 3.12.2, and 3.12.9).  This is inaccurate.

77.     Regarding PWS 3.3.5, for example, the PWS said:

3.3.5  The Contractor shall produce Performance Specifications IAW DI-IPSC-81431 (CDRL A028), System / Subsystem Design Descriptions IAW DI-IPSC-81432 (CDRL A029), Interface Design Descriptions IAW DI-SDMP-81436 (CDRL A061), Detailed Specification Documents IAW DI-SDMP-81464 (CDRL A030), and Interface Control Documents IAW DI-SESS-81248 (CDRL A020).

78.     SDI responded to this PWS section in detail, ████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████  It wrote:



79.     The Agency appears to have missed or ignored this.  The same was true of the other cited PWS sections, which renders the Agency's  assigned weaknesses arbitrary and capricious and irrational.

80.     SDI was prejudiced.  As evaluated, the adjectival ratings SDI received are inconsistent with the corresponding definitions, while the Agency inflated Strata-G's ratings and then leveled them to reduce their importance.  Moreover, the Agency assigned SDI several weaknesses in error.  Had the Agency properly evaluated proposals, SDI would have received higher adjectival ratings than Strata-G.  When combined with a higher past performance rating, realistic price and professional compensation, as well as no OCIs, SDI would have received award.

## COUNT THREE
## THE AGENCY ARBITRARILY AND IRRATIONALLY DEEMED STRATA-G'S LOW PRICE AND ITS PROFESSIONAL COMPENSATION PLAN REALISTIC

81.     SDI realleges and incorporates the allegations of the preceding paragraphs by reference as if fully set forth herein.

82.     SDI's proposed price was ▉▉▉▉▉▉ and its TEP was ▉▉▉▉▉▉.  The Agency told SDI that the IGE was ▉▉▉▉▉▉, which is ▉▉▉▉▉▉▉▉▉▉▉ than SDI's proposed price and ▉▉▉▉▉▉ than the TEP.  Strata-G's price was ▉▉▉▉▉▉▉ than SDI's price and the IGE—▉▉▉▉▉▉, respectively.  Yet the Agency found Strata-G's low price realistic.

83.     Performing the actual requirements with the necessary personnel is not possible at that price (as the IGE indicates).  To reach that price, Strata-G would have to take almost no profit, have no pass-through costs, or propose labor categories incapable of performing the technical approach or labor categories at unrealistically low rates.

84.     Strata-G's low price also shows it proposed an unrealistically low professional compensation plan.  SDI's proposed market compensation was in line with the market for highly educated professionals who are in high demand, ███████████████████ for the same labor categories on a similar contract(s).  SDI's basis of estimate contained all the ████████████.  Strata-G did not propose a compensation package that was similar or in line with market requirements.

85.     SDI was prejudiced.  As evaluated, the adjectival ratings SDI received are inconsistent with the definitions while giving Strata-G inflated ratings and then leveling them to reduce their importance.  Moreover, the Agency assigned SDI several weaknesses in error.  Had the Agency properly evaluated proposals, SDI would have received higher adjectival ratings than Strata-G.  When combined with a higher past performance rating, realistic price and professional compensation, as well as no OCIs, SDI would have received award.

## COUNT FOUR
## THE AGENCY'S BEST VALUE DECISION WAS ARBITRARY AND IRRATIONAL

86.     SDI realleges and incorporates the allegations of the preceding paragraphs by reference as if fully set forth herein.

87.     The Agency selected Strata-G because it had an "excellent" technical approach and proposed a lower price.  As explained above, these evaluations were arbitrary and irrational.

88.     The source selection authority relied on these incorrect ratings in making award. Had the authority received a factual evaluation or reviewed the facts independently, he or she would have realized that the underlying evaluators made erroneous decisions and improperly leveled technical proposals.  The best value decision was therefore arbitrary and irrational.

89.     Further, the SSA improperly minimized the benefits that SDI offered and overstated the value of the benefits Strata-G offered, which artificially inflated Price's importance.  In essence, this converted this best value acquisition to LPTA.  This prejudiced SDI because, correctly evaluated, SDI was the higher rated bidder and its additional benefits would have warranted the additional price.  In other words, correctly evaluated, SDI stood a substantial chance of award, even at its higher price.

**PRAYER FOR RELIEF**

WHEREFORE, SDI requests that this Court:

A.     Enter a preliminary injunction prohibiting performance of the contract under the Solicitation.

B.     Declare that the Agency's evaluation and award were arbitrary, irrational, and contrary to law.

C.     Permanently enjoin the performance of the award of the contract under the Solicitation.

D.     Require the Agency to perform a proper evaluation and make a proper award decision as required by law; and

E.     Award SDI such other and further relief as the Court may deem just and proper, including, without limitation, bid and proposal costs.

Dated: March 28, 2023                    Respectfully submitted,


                                         s/ W. Brad English
                                         _____
                                         W. Brad English
                                         Jon D. Levin
                                         Emily J. Chancey
                                         Joshua B. Duvall
                                         Nicholas P. Greer

                                         *Attorneys for Plaintiff System Dynamic
                                         International, Inc.*

**OF COUNSEL:**
MAYNARD, COOPER & GALE, P.C.
655 Gallatin Street SW
Huntsville, Alabama 35801
Telephone:      (256) 512-5705
Facsimile:      (256) 512-0119
Email:          benglish@maynardcooper.com

**Certificate of Service**

I hereby certify that on March 28, 2023, I caused copies of the foregoing to be served by

electronic mail upon the following:

> U.S. Department of Justice
> Commercial Litigation Branch
> National Courts Section
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C.  20044

/s/ W. Brad English
W. Brad English